OHIO CASUALTY INS. CO. *v.* BOARD OF EDUCATION OF FAIRFIELD TOWNSHIP, MADISON COUNTY.

(Decided May 5, 1928.)

*Mr. A. I. Vorys* and *Mr. John M. Vorys,* for plaintiff in error.

*Mr. D. M. Richmond,* prosecuting attorney, and *Messrs. Murray & Emery,* for defendant in error.

KUNKLE, J. This action involves the right of the board of education of Fairfield township, Madison

county, Ohio, to maintain its suit against the Ohio Casualty Insurance Company upon a bond given said board of education by said insurance company in the sum of $15,000, to secure certain deposits made in the Commercial Bank of West Jefferson. It appears, in brief, from the record, that in June, 1926, the board of education of Fairfield township, by motion duly adopted, designated the Commercial Bank of West Jefferson as the depository for the school funds. The bid of the said Commercial Bank of West Jefferson, Ohio, of 4 per cent. on the average daily balance, was accepted on June 6, 1926, at a special meeting of said board of education. Such acceptance was upon the condition that such bank furnish surety bond in the sum of $15,000. At a subsequent meeting of said board of education held June 18, 1926, the surety bond of the Commercial Bank of West Jefferson, Ohio, in the sum of $15,000, furnished by the Ohio Casualty Insurance Company of Hamilton, Ohio, was approved and accepted. This is the bond in controversy. The bond was placed in the safety deposit vault of the Farmer's Bank, at West Jefferson, Ohio, by the clerk of the school board, where the insurance policies, interest coupons, and other papers of value belonging to the board, were deposited.

The clerk testifies as follows:

"Q. After this resolution that you read last, of June 18, 1926, did the Board of Education of Fairfield Township take any further action from that time to the present concerning this bond? A. No sir, they did not.

"Q. Is there anything in your minutes or record pertaining to this bond from that last resolution read? A. There is none.

"Q. Was the subject-matter of this bond ever brought to the 'Board's attention after that time while they were acting as a Board of Education? A. It never was."

In substance, the condition of the bond was that the depository should pay over all money deposited and all the interest upon demand. The period covered by the bond was from June 15, 1926, to June 5, 1927.

The bond also, among other things, contained the following provision: "The surety upon giving five days' notice in writing to the obligee may at any time cancel this bond and terminate its responsibility hereunder for any default of the depository occurring after the expiration of said five days."

As above stated, the bond was deposited by C. G. Harsh, the clerk of the board of education, in the safety deposit box of the board in the Farmers' Bank of West Jefferson, Ohio. The following is found in the testimony of Mr. Harsh, the clerk of the board:

"Q. Well, now, just proceed and tell what happened to it after you left it in the safety deposit box? A. On Friday evening previous to the closing of the bank by the State Department at West Jefferson, I think it was May 6th, we were getting ready to go to an entertainment put on by the children at the school building, Mr. Gregg came and rapped at our door—

"Q. Who do you mean? A. Mr. Ashton Gregg.

"Q. You say we, who do you mean by we? A. My wife and I and family. Mr. Ashton Gregg, Cashier of the Commercial Bank of West Jefferson, came to my door and rapped; I invited him in, he said no, it wasn't worth while. He said: Cecil, I came down

after that bond The Ohio Casualty Insurance Company gave you. He said here is another bond, he handed me a personal bond of $15,000, signed by himself and other officers of the bank; I do not remember all the signatures. He said it will hold you for a while, until the application that we have made to another bond company goes through, and we will give you another surety bond. I looked at it a while and knowing the men's signatures, they all looked genuine, I asked him—I said, Mr. Gregg why do you want this surety bond? Well, he said the bond is of no value to you, the bond company has ceased to write surety insurance, they failed to deposit enough money with the State Department, I don't know what department, to enable them to write that kind of insurance. They are confining all their insurance in the future to automobile liability. He said I would like to get that bond right away, he said it ought to have been in several days ago. I said I haven't time to hunt it up now, the family is ready to go down to the school building and I am not ready. I said I can't look for it. He seemed to be insistent that I get it at once. I told him I would come in to West Jefferson, I had a few deposits to put in belonging to the School Board, I would bring it in then or look it up. I told him that night that I didn't know whether it was in the safety deposit box in West Jefferson or in my desk at home. I told him I would look the matter up. He said tomorrow would be all right. The next day at noon, after looking for it at home, I procured this bond and upon Mr. Gregg's representations that it was of no value to me—

"By Mr. Vorys. If the court, please, we object to the last statement of the witness, and ask that it be stricken out.

"By the Court. The conclusion of the witness may be stricken out.

" (Witness continues answer) I procured the bond from the safety deposit vault and gave it to Mr. Gregg, at the same time I deposited a few dollars, I do not remember the exact amount, possibly $18 or $20, the records will show. That was the last I saw of the bond.

"Q. Had you discussed this matter with the Board of Education before you surrendered the bond? A. No, sir, I hadn't mentioned it to the School Board.

"Q. Had you been authorized or directed in any way by the Board of Education to surrender that bond?

"By Mr. Vorys. We object to that question.

"By the Court. You may answer the question.

"By Mr. Vorys. Save our exceptions.

"A. No sir.

"Q. After you surrendered the bond was there any action taken by the Board of Education ratifying your act? A. No, sir.

"Q. Was there any action—or do your minutes show any action whatever being taken by the board with reference to the matter? A. They do not.

"Q. I hand you this paper marked B and ask you to state what that is. A. It is the personal bond that Mr. Gregg gave me that evening.

"Q. What did you do with that personal bond? A. I gave it to our attorneys.

"Q. And in whose possession has it been ever since? A. In their possession.

"Q. Was this document marked B, this personal bond, ever presented to the Board of Education? A. It was not.

"Q. Has any action ever been taken by the Board of Education with reference to this personal bond marked B? A. None whatever.

"Q. Well now, after you surrendered that original bond marked A to Mr. Gregg, what next did you do with reference to that bond? A. I didn't do anything for a few days until my wife,—somebody told us the day the bank was closed by the State Banking Department, I believe it was our mail-man told us that the State Department had closed the doors of the Commercial Bank. I went up to the President's, Mr. Lawles resides within possibly half a mile, and asked him if he heard that the Commercial Bank had been closed by the State Department, he said he hadn't. I had my machine there, he was busy, but he said he would leave his work and we would go to West Jefferson to see. We found that the rumor was true, that the State Department had closed the bank. I told him when I went up to see him at noon, the day the bank was closed, of this transaction that I have just told the Honorable Judge and the jury, about Mr. Gregg procuring this bond and leaving this other one. That was the first that Mr. Lawles knew about it, or any other school board member."

The above testimony is substantially undisputed.

It appears from the record that Ashton Gregg was not only the cashier of the Commercial Bank of West Jefferson, the depository of the school board, but was also the agent or representative of plaintiff in error, the Ohio Casualty Insurance Company. There was some correspondence between the Ohio Casualty Insurance Company and Ashton Gregg relating to the bond, which finally resulted in the application of

Gregg to Harsh for the surrender of the bond. The representations of Gregg, the cashier of the bank and the agent or representative of the insurance company, to Harsh, the clerk of the Board of Education, to the effect that the surety company was going out of business in Ohio and withdrawing its deposit with the state to guarantee its contracts in Ohio, etc., resulted in the clerk delivering to Ashton Gregg the surety company bond and accepting Gregg's personal bond as surety. This transaction took place on March 7, 1927, while the original surety bond was in full force and effect. The surety bond, according to its terms, was in full force at the time of its surrender by the clerk. The bond was forwarded by Ashton Gregg to the insurance company, where the obligation represented by the bond was marked cancelled as of date March 7, 1927.

It is claimed by the insurance company that they had no knowledge that Gregg was cashier of the Commercial Bank of West Jefferson, and that they dealt with him solely as their representative. Prior to the transaction of May 7, 1927, the insurance company had some correspondence with Gregg as to the reports of the Commercial National Bank, and as to its condition, which led the surety company to insist upon Gregg securing a release of the bond, or, in the absence of such release on or before March 9th, that a notice be given to the board of education of Fairfield township to secure a new bond within the five days provided in the contract of insurance.

Various questions are presented in the record for the consideration of this court.

The first question relates to the authority of Harsh, as clerk of the board of education, to sur-

render the surety bond. It is apparent to us that Harsh did not confer with any member of the board of education in reference to the release or surrender of the surety bond, and that no member of the board of education had any knowledge of said release until after the bank failed and its doors had been closed. Upon receiving notice that the surety bond had been delivered to Gregg by Harsh, and that the bank had failed, the board of education took action adverse to the claim of the surety company in reference to the surrender of the bond.

In reference to the claim of counsel for plaintiff in error that Harsh, the clerk of the board of education, was constructively the agent of the board of education, we find that while Harsh, under the statute, was made the custodian of the bond, as well as other papers and documents of the board of education, he nevertheless had no authority by virtue of the statute to represent or bind the board in the release or surrender of the bond. In our opinion, no one had authority to release or surrender this bond except the board of education of Fairfield township.

We are also clear that even if Harsh had been the representative of the board of education, and the surety company had served upon him a written notice upon March 9, 1927, for the cancellation of the bond, such written notice requiring the bank to furnish a new bond could not have been complied with within the time necessary to release the insurance company before failure of the bank, which took place on March 12, 1927.

It is contended that the equity and justice of the case is with the insurance company, inasmuch as the

insurance company, when it received the bond from Gregg, assumed that it had been duly surrendered by the board of education, and relied upon the action of the clerk of the board of education in surrendering the bond. We do not doubt that the surety company upon receipt of this bond assumed that its possession had been secured in a regular manner. However, Ashton Gregg, whom they trusted to secure the release and surrender of the bond, obtained such release only from the clerk, and did not consult the board of education in whose behalf the bond was issued.

The insurance company, when it assumed that its policy had been released, was acting upon the representations of its agent, Ashton Gregg, and not upon any action taken by the board of education. The bond was not cancelled by the board of education, nor was there any indorsement upon the bond showing a cancellation or release by or on behalf of the board of education. The insurance company, therefore, must have relied solely upon the surrender of possession of the bond by the clerk of the board of education to Ashton Gregg, and upon the delivery of the policy of insurance by Gregg to such insurance company. This, in our judgment, would not put the insurance company in a position where it could claim any superior equity over the board of education in respect to said bond.

We have carefully considered all of the grounds of error claimed, and also the various authorities cited in the very exhaustive brief of counsel for plaintiff in error, and have given full consideration to the reasoning found in said brief; but upon a consideration of such authorities, when applied to the peculiar

facts in this case, we cannot escape the conclusion that the board of education, upon such facts, is entitled to recover upon the bond in question. The judgment of the lower court will therefore be affirmed.

*Judgment affirmed.*

FERNEDING and ALLREAD, JJ., concur.